STATE OF NORTH CAROLINA v. OTIS TREMAINE HIGHTOWER

No. COA04-324

(Filed 1 March 2005)

**1. Evidence— prior crimes or bad acts—involvement in gang— robberies—drug dealing—motive and intent—modus operandi**

The trial court did not commit plain error in a first-degree felony murder case by admitting evidence of defendant's prior illegal activity including involvement in the Jericho gang, prior

STATE v. HIGHTOWER

[168 N.C. App. 661 (2005)]

robberies, and drug dealing, because: (1) the testimony about the gang provided evidence of defendant's motive as well as the reason for a coparticipant's involvement in the crime; (2) the testimony about defendant's pattern of robbing others of illegal drugs and selling them provided evidence of defendant's motive and intent to commit the crimes at bar as well as his modus operandi; (3) considering the other overwhelming evidence of defendant's guilt presented through numerous eyewitnesses, the admission of this evidence was not plain error; and (4) although defendant contends he received ineffective assistance of counsel based on his attorney's failure to object to the evidence of defendant's prior bad acts, the admission of the Rule 404(b) evidence was not error.

## 2. Jury— selection—stating murder case tried noncapitally

The trial court did not err in a first-degree felony murder case by informing the jury pool that the case would be tried noncapitally because defendant failed to show, and the Court of Appeals did not find, any prejudice to defendant in the trial court's statement.

## 3. Sentencing— life without parole—*Enmund/Tison* issues

The trial court did not err in a first-degree felony murder case by imposing a sentence of life without parole without a jury finding of the *Enmund/Tison* issues, because: (1) both *Enmund* and *Tison* involved proportionality review of death sentences, and their application is not implied in noncapitally tried cases; and (2) defendant failed to show any basis to extend the application of proportionality to a noncapital verdict and judgment.

Appeal by defendant from judgment entered 31 October 2003 by Judge Orlando Hudson in Caswell County Superior Court. Heard in the Court of Appeals 2 December 2004.

*Attorney General Roy Cooper, by Assistant Attorney General C. Norman Young, Jr., for the State.*

*Bruce T. Cunningham, Jr., for defendant-appellant.*

TYSON, Judge.

Otis Tremaine Hightower ("defendant") appeals from judgment entered after a jury found him to be guilty of first-degree felony murder and first-degree burglary. We hold defendant received a fair trial free from prejudicial error.

## I. Background

### A. The Brothers

The State's evidence tended to show that on 4 January 2003, nineteen-year-old Brian Bigelow ("Bigelow"), his seventeen-year-old brother T.W., and others were present at Marcus Sellars' ("Sellars") house "playing Playstation 2" and "smoking marijuana." Defendant "came in the house smoking, smoking a blunt[,] holding a beer and with his gun." Defendant told those present, including the brothers, Bigelow and T.W., that he needed "to do a lick" because "he had spent all his money on Christmas presents . . . ." Bigelow testified that a "lick" meant "a robbery."

Defendant asked Bigelow and T.W. to participate. Bigelow at first refused because the intended victim, Edgar Williamson ("Williamson"), also known as "Eck," was his friend. Sellars and others harassed Bigelow and T.W. for not wanting to participate and called them names. Sellars informed Bigelow, "If you pull something like that, y'all be in Jericho. You would be done did [sic] something that showed you got heart."

Bigelow testified that the "Jericho Gang" consisted of his cousins and a few outsiders. To become a member of the gang, one had either to be "beaten in" by the members or rob someone. This gang would "hang out" at Sellars' house where they would drink, smoke marijuana, and sell drugs. According to Bigelow, defendant was one of the older members of the gang.

Later, Sellars asked defendant to take Bigelow and T.W. to the store and purchase "some beer and blunts." Sellars handed Bigelow and T.W. guns. Sellars also gave Bigelow a black toboggan with holes in it, and T.W. was given a "grayish stocking."

Defendant, Bigelow, and T.W. went to the convenience store and purchased "beer and blunts." After leaving the store, defendant drove past Sellars' house, but did not stop. Defendant told Bigelow, "We're going to pull this lick. . . . you want to get out, jump out." Bigelow and T.W. remained in the vehicle while defendant drove to Williamson's house. Williamson was standing outside in his yard. Defendant drove by the house about "five times" before parking the car two houses up the street from Williamson's house. Defendant told Bigelow and T.W. to "get out of the car and don't get in the house acting like no bitch," or he would shoot them. Defendant was wearing a "red stocking cap, [with] a camouflaged hat over top of it with a towel around his neck."

T.W. pulled the stocking cap over his head. Bigelow wore a ski mask over his face.

Defendant kicked in the door of the house, threw a "big woman" onto the floor, and put a gun to her head. Defendant instructed Bigelow and T.W. to "get the weed." T.W. entered one of the bedrooms and informed defendant that he could not locate the marijuana. Defendant walked down the hall, holding his gun to the "big woman's" head. He ordered her to give him "the weed." She retrieved a "big bag of marijuana" from under a mattress and handed it to defendant.

Defendant, Bigelow, and T.W. entered the kitchen area. Upon a knock at the door, Bigelow opened the rear door, and Lenny Benoit ("Benoit") entered the kitchen. Benoit recognized the brothers and stated, "That's Brian and Tom-Tom." Defendant stated, "I don't know no mo---- f------ Brian and Tom-Tom; I should knock your mo---- f------ teeth out right now." In response, according to Bigelow, Benoit just laughed and smiled. Defendant pointed his gun toward Benoit and fired. Bigelow and T.W. immediately left Williamson's house and ran towards the car, leaving defendant inside the house. About "thirty-seconds later," defendant returned to the car and drove away from the house. Bigelow and T.W. told defendant, "you didn't have to kill that boy," to which defendant responded, "Shut the f--- up before I shoot you."

Defendant, Bigelow, and T.W. returned to Sellars' house and divided up the marijuana. Sellars received two ounces, and Bigelow and T.W. each received one ounce. Defendant left Sellers' house.

On 13 January 2003, both Bigelow and T.W. went to the Caswell County Sheriff's Department and gave a statement. Bigelow's statement was admitted into evidence. T.W. also testified and recounted his involvement in the 4 January 2003 shooting, which was consistent with his brother's statement.

### B. Rose Webb

Rose Webb ("Webb") testified that she knew Williamson and was visiting at his home on the evening of 4 January 2003 with her nine-year-old son and her fourteen-year-old-cousin, J.C. After Williamson and her son went to the store, someone knocked at the door while Webb was in the kitchen. She looked out and saw a person standing against the house wearing a red mask, like a toboggan. Later, this person kicked in the door. The person pointed a gun to her head, and she went down on her knees onto the kitchen floor. Webb stated that after

someone ran past her, she was told to get up and go into the back room, where her cousin J.C. was also located. Webb heard a gunshot and a girl scream. When she heard the scream, she saw a "teenager" standing near the door.

Webb entered the living room and saw a body lying on the kitchen floor and blood splattered by the stove. She also observed a girl crying and screaming, and asked whether the man on the floor was breathing.

### C. Ashley Coble

Ashley Coble ("Coble") testified that she went to high school with Benoit. On 4 January 2003, Benoit and his girlfriend, J.C., picked her up and drove to Williamson's home around 7:30 p.m. Williamson and Benoit were cousins.

They parked outside near the back door. When J.C. turned the radio off, Benoit told her "something wasn't right" because the back door was open, that it was "never opened." As Benoit approached the door, he saw and read a note on the door. Three men came and slammed the door in his face. Benoit told the men to "quit playing" and knocked on the door again.

The men opened the door and all three huddled around Benoit. Coble described each of the three men and stated that two were wearing what appeared to be ski masks. The third had "something" on top of his head. Coble testified all three men had guns. Coble testified Benoit called for J.C., and Coble and J.C. ran into the house. Benoit was lying wounded on the floor.

### D. Deputy Brandon

Caswell County Deputy Sheriff Gwynn Brandon ("Deputy Brandon") responded to a call at 881 Boy Scout Camp Road on 4 January 2003 around 8:00 p.m. When he arrived, he found Benoit lying halfway out of the back door of the residence.

Benoit appeared to have been shot in the lower stomach on the left side. Deputy Brandon stated that he could see several spots of blood on the floor inside the kitchen that appeared to be "fairly fresh." In addition, he observed that Benoit's condition was extremely critical. His eyes had rolled back in his head, and he was gasping for breath. Benoit later died from his wounds. Inside the front part of the house, Deputy Brandon found Webb and J.C. The front door had been blocked with a sofa and chairs.

Defendant did not testify or offer any evidence. The jury found defendant to be guilty of first-degree felony murder and first-degree burglary. As the burglary conviction was an element of the crime of felony murder, the trial court sentenced defendant to life imprisonment without parole for the first-degree murder conviction. Defendant appeals.

## II. Issues

The issues on appeal are whether the trial court erred by: (1) admitting evidence of defendant's prior illegal activity; (2) informing the jury pool that the case would be tried non-capitally; and (3) imposing a sentence of life without parole without a jury finding of the *Enmund/Tison* issues.

Defendant's remaining assignments of error are explicitly waived in his brief. He concedes pursuant to the North Carolina Rules of Appellate Procedure, these assignments of error "cannot be pursued based upon the record currently before the Court." *See* N.C.R. App. P. 28(b)(6) (2004) ("Assignments of error not set out in the appellant's brief or in support of which no reason or argument is stated or authority cited, will be taken as abandoned."). These remaining assignments of error are deemed abandoned.

## III. Prior Bad Acts

[1] Defendant contends the trial court committed plain error by allowing evidence of defendant's involvement in the Jericho gang, prior robberies, and drug dealing. We disagree.

Defendant failed to object to the admission of this evidence and argues plain error.

> Where evidence is admitted without objection, the benefit of a prior objection to the same or similar evidence is lost, and the defendant is deemed to have waived his right to assign as error the prior admission of evidence. Having failed to object, defendant is entitled to relief based on this assignment of error only if he can demonstrate plain error. Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result. The appellate court must study the whole record to determine if the error has such an impact on the guilt determination, therefore constituting plain error.

*State v. Berry*, 143 N.C. App. 187, 193, 546 S.E.2d 145, 151 (internal quotations and citations omitted), *disc. rev. denied*, 353 N.C. 729, 551 S.E.2d 439 (2001).

Rule 404(b) of the North Carolina Rules of Evidence states:

Evidence of other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2003). Rule 404(b) is:

a clear general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.

*Berry*, 143 N.C. App. at 196, 546 S.E.2d at 153.

### A.  Gang Activity

At trial, the State presented evidence through Bigelow's testimony that defendant was a member of the Jericho Gang. This testimony provides evidence of defendant's motive, as well as the reason for Bigelow's involvement in the crime. Defendant approached Bigelow, stated that he needed to do a "lick," and told Bigelow that in order to become a gang member, you had to "rob someone."

Presuming error, without finding the trial court erred, defendant failed to show that the jury would have reached a different result had the trial court excluded this evidence. Considering the other overwhelming evidence of defendant's guilt, presented through numerous eyewitnesses, we hold the admission of this testimony is not plain error. This assignment of error is overruled.

### B.  Past Robberies and Drug Dealing

Defendant also argues the trial court committed plain error by allowing into evidence defendant's past robberies and prior drug dealing. Both Bigelow and T.W. testified that defendant had a pattern of robbing others of illegal drugs and selling them. This testimony pro-

vided evidence of defendant's "motive," and "intent" to commit the crimes at bar, as well as his *modus operandi.* N.C. Gen. Stat. § 8C-1, Rule 404(b). Prior to encountering the victim, defendant, Bigelow, and T.W. planned to rob Williamson of his marijuana. Defendant executed this plan, stole marijuana from Williamson's home, and subsequently distributed the stolen drugs. Benoit was murdered during the commission of this crime.

Admission of this evidence was not error under Rule 404(b). Further, defendant has failed to show that under plain error review, the admission of this evidence prejudiced his defense such that the jury would have reached a different result. This assignment of error is overruled.

### C. Ineffective Assistance of Counsel

Defendant also argues his attorney's failure to object to the evidence of defendant's prior bad acts constitutes ineffective assistance of counsel. "In reviewing an appeal based on ineffective assistance of counsel, this Court must first determine whether there was a reasonable probability that without counsel's alleged errors, the outcome of the trial would have been different." *State v. Carrillo*, 164 N.C. App. 204, 211, 595 S.E.2d 219, 224 (2004) (citing *State v. Braswell*, 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985)), *appeal dismissed and disc. rev. denied*, —— N.C. ——, 610 S.E.2d 710 (2005). We held the admission of this Rule 404(b) evidence was not error. This assignment of error is without merit.

### IV. Statements During Jury Selection

[2] Defendant argues the trial court erred by informing the jury, prior to trial, that he was not being charged with capital murder. We disagree.

At the outset of jury selection, the trial court informed the jury:

The defendant is charged with the offense of first-degree murder. Members of the jury, this is a noncapital murder case. If you find the defendant guilty of the offense [of] first-degree murder, the highest punishment would be life imprisonment in the Department of Correction without the benefit of parole and not the death penalty. The death penalty is not a possible punishment in this case. . . .

Defendant cites only one case, *State v. Hines*, 286 N.C. 377, 211 S.E.2d 201 (1975), to support his argument. In *Hines*, our

Supreme Court granted a new trial because of statements by the prosecutor during jury selection in a rape trial, where the defendant was being tried capitally: "And to ease your feeling, I might say to you that no one has been put to death in North Carolina since 1961." 286 N.C. at 382, 211 S.E.2d at 204. The *Hines* Court reasoned that the defendant was entitled to a new trial because the prosecutor's "statement was intended to, and in all probability did, lighten the solemn burden of the jurors in returning their verdict." 286 N.C. at 386, 211 S.E.2d at 207.

Here, defendant argues the trial court's statement that this case was to be tried non-capitally "was intended to" and did "lighten the solemn burden of the jurors . . . ." *Id.* The State argues the trial court's statement was made for no other purpose other than to inform the jury regarding the status and posture of the case before it.

Our Supreme Court has stated, "the trial judge should not inform the jurors as to punishment in non-capital cases. . . . When, however, such information is inadvertently given, the error will be evaluated like any other." *State v. Rhodes*, 275 N.C. 584, 592, 169 S.E.2d 846, 851 (1969) (citation omitted). In *Rhodes*, the Court held, "it was error for the trial judge to tell the jury the punishment for assault with intent to commit rape, but we can perceive no prejudice to defendant from the disclosure." *Id.* Similarly, defendant has failed to show and we find no prejudice to defendant in the trial court's statement. This assignment of error is overruled.

## V. *Enmund/Tison*

[3] Defendant contends the imposition of a sentence of life imprisonment without parole constitutes a cruel and unusual punishment under the United States Supreme Court cases of *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140 (1982), and *Tison v. Arizona*, 481 U.S. 137, 95 L. Ed. 2d 127, *reh'g denied*, 482 U.S. 921, 96 L. Ed. 2d 688 (1987).

> In *Enmund*, "the Court held that the Eighth Amendment forbids the imposition of the death penalty on a defendant who aids and abets in the commission of a felony in the course of which a murder is committed by others, when the defendant does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *State v. McCollum*, 334 N.C. 208, 223, 433 S.E.2d 144, 151 (1993), *cert. denied*, [512] U.S. [1254], 129 L. Ed. 2d 895, 114 S. Ct. 2784 (1994). A

later case, *Tison v. Arizona,* 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676 (1987), limited the holding in *Enmund* to exclude defendants who were major participants in a felony that results in death when their actions constituted reckless indifference to human life.

*State v. Walker,* 343 N.C. 216, 224, 469 S.E.2d 919, 923, *cert. denied,* 519 U.S. 901, 136 L. Ed. 2d 180 (1996).

Both *Enmund* and *Tison* involved proportionality review of death sentences. *Walker,* 343 N.C. at 224, 469 S.E.2d at 923. Our review of North Carolina Supreme Court cases discussing *Enmund* and *Tison* fails to disclose any application in non-capitally tried cases. *See, e.g., State v. Watts,* 357 N.C. 366, 584 S.E.2d 740 (2003), *cert. denied,* 541 U.S. 944, 158 L. Ed. 2d 370 (2004); *State v. Golphin,* 352 N.C. 364, 533 S.E.2d 168 (2000), *cert. denied,* 532 U.S. 931, 149 L. Ed. 2d 305 (2001); *State v. McCollum,* 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied and reh'g denied,* 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

On the facts at bar, defendant has failed to show any basis to extend the application of proportionality factors to a non-capital verdict and judgment. This assignment of error is overruled.

## VI. Conclusion

The trial court did not err by admitting evidence of defendant's gang membership and prior bad acts under Rule 404(b). Both provided evidence of defendant's motive and intent in committing the crime at bar. The trial court's statement to the jury regarding the non-capital nature of the trial was not error. Defendant has failed to show *Enmunds/Tison* review applies to this non-capital verdict judgment. Defendant received a fair trial free from prejudicial error.

No Prejudicial Error.

Judges TIMMONS-GOODSON and GEER concur.